UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| JEFFERY BOWMAN, JAMES ARNOLD,<br>JUSTIN DESPOT, MICHAEL WEBSTER,<br>& DANIEL FAGAN, on behalf of themselves<br>and all other similarly situated employees,<br><br>Plaintiffs,<br><br>v.<br><br>NEW VISION TELECOMMUNICATIONS,<br>INCORPORATED; NVT GEORGIA INC.;<br>FRANKLIN GLASPIE; JERRY WILKINS;<br>and ERIC L. SAWYER,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | No. 3:09-1115<br>JUDGE ECHOLS |

## MEMORANDUM

Plaintiffs Jeffery Bowman, James Arnold, Justin Despot, Michael Webster, and Daniel Fagan, on behalf of themselves and all other similarly situated employees, filed an Amended Collective Action Complaint alleging that Defendants intentionally mis-classified Plaintiffs and other cable installation technicians as "independent contractors" rather than employees, and, as a result, Defendants' overtime compensation practices violated the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.* Plaintiffs also alleged in their Amended Complaint that Defendants committed retaliatory acts against the Plaintiffs in violation of the FLSA after Defendants received notice that the lawsuit had been filed.

On November 25, 2009, at 9:35 a.m., District Judge Aleta A. Trauger granted Plaintiffs' Motion For A Temporary Restraining Order ("TRO"). (Docket Entry Nos. 10, 13.) In the TRO, Judge Trauger ordered the Defendants to maintain Plaintiffs on the payroll with full pay and benefits

1

until a hearing could be held on their request for a preliminary injunction. She also required the Defendants to issue notice to all employees and post a notice on the premises of their offices stating that no retaliatory action would be taken against any individual for exercising his or her rights under the FLSA.

Pending before this Court is Plaintiffs' Motion for a Preliminary Injunction. (Docket Entry No. 10.) The Court held an initial hearing on the motion on Thursday, December 3, 2009. The named Defendants did not appear in person, but they were represented at the hearing by their counsel, Leslie Solondz. After hearing Plaintiffs' evidence on the issues of Defendants' retaliation and failure to comply with the terms of the TRO, the Court continued the preliminary injunction hearing to Thursday, December 10, 2009, to give the Defendants an opportunity to prepare and present evidence. For the interim period, the Court extended and modified the terms of the TRO. (Docket Entry No. 19.)

On Friday, December 4, 2009, Ms. Solondz filed a motion to withdraw (Docket Entry No. 23), which the Court granted in a separate Order (Docket Entry No. 28). Due to this development, Defendants did not file a response to the motion for a preliminary injunction by 5:00 p.m. on Monday, December 7, 2009, as ordered by the Court. By the time of the continued preliminary injunction hearing on Thursday, December 10, Defendants had not yet retained substitute counsel. The individual Defendants, however, filed a *pro se* response and appeared personally at the hearing.

Because the law is clear that a corporation may appear in federal court only through licensed counsel, Rowland v. California Men's Colony, 506 U.S. 194, 201-202 (1992); Doherty v. American Motors Corp., 728 F.2d 334, 340 (6th Cir. 1984), the individual Defendants acting *pro se* are not permitted to represent the corporate Defendants New Vision Telecommunications, Inc., and NVT

2

Georgia Inc. Thus, the corporate Defendants have not filed any response in opposition to the motion for a preliminary injunction.

## I. <u>FINDINGS OF FACT</u>

The Plaintiffs filed their FLSA lawsuit through counsel on Friday, November 20, 2009. The Plaintiffs reported for work as usual at approximately 7:00 a.m. on Monday morning, November 23. At that time the Plaintiffs asked to speak as a group to the Operations Manager of Defendants' Nashville office, Jeremy Wyatt. One of the Plaintiffs secretly tape recorded the conversation. Plaintiffs notified Wyatt that they had filed an FLSA lawsuit seeking unpaid overtime compensation, and they explained their reasons for filing the lawsuit. They assured Wyatt they wanted to continue to do their jobs, the filing of the lawsuit was not "personal," and they hoped there would be no retaliation against them for having filed the lawsuit.

In response, Wyatt told the Plaintiffs he knew they were employees who were entitled to overtime and they had been previously mis-classified as independent contractors. He agreed that nothing had changed when the company began issuing W-2s instead of 1099s. Wyatt revealed he had earlier told the company's owners, Frank Glaspie and Jerry Wilkins, that some of their pay practices were not legal. He understood Plaintiffs' reasons for filing the lawsuit, but he thought Glaspie and Wilkins might not understand Plaintiffs' reasons, stating, "You know those two gentlemen in the room back there[,]" "You know how they are[,]" and "they look out for number one."

Plaintiffs left Wyatt's office and completed their ordinary work routes that day. Plaintiffs did not distribute copies of the lawsuit or flyers about the lawsuit to other employees or otherwise engage in conduct disruptive to the work place.

3

Wyatt informed the Defendants about the lawsuit. Plaintiffs' attorney also sent a copy of the complaint by facsimile to the Defendants' Atlanta office around 2:15 p.m., on Monday afternoon, November 23, 2009, before the Defendants were served with process. Upon learning about the lawsuit, Defendants Glaspie, Wilkins, and Eric Sawyer, the Chief Financial Officer in Nashville, instructed Wyatt not to give any of the Plaintiffs routes with job assignments on the following morning, November 24. Glaspie, Wilkins, and Sawyer jointly made the decision to suspend all five Plaintiffs without pay for an indefinite period. Wyatt admitted he learned of the plan to suspend the Plaintiffs on the evening of November 23.

Plaintiff Michael Webster is a lead technician with some supervisory responsibilities. He was previously Defendants' Operations Manager in Nashville between December 24, 2008 and August 17, 2009. On the evening of November 23, 2009, Webster received a telephone call at home from David Wyatt, the father of Jeremy Wyatt. David Wyatt is also a former manager of the Defendants' Nashville office. David Wyatt informed Webster that the Defendants intended to terminate the employment of the Plaintiffs the following day.

Plaintiff James Arnold received a cell phone call on the evening of November 23 from Dennis Urban, an area supervisor for Defendants. Urban told Arnold he could save Arnold's job if he took his name off of the lawsuit. (Docket Entry No. 12, Arnold Decl. ¶ 4.) Although Sawyer claimed during his testimony that Arnold made a threat to Urban that Arnold planned to inform Comcast, the Defendants' only client, of several work-related issues and Defendants' employment of individuals with criminal records who were not qualified to work for Comcast, Arnold denied that he made any such threats and Defendants did not call Urban to testify. Therefore, the Court finds on the evidence before it that no such threats were made.

4

When the Plaintiffs reported for work as usual at approximately 7:00 a.m. the next day, Tuesday, November 24, 2009, they were told there were no work assignments for them that day. Plaintiff Webster asked Wyatt if he could expect to work that day and Wyatt laughed. Wyatt informed the Plaintiffs that Glaspie and Wilkins were on their way to Nashville from Atlanta and there would be a meeting with the Plaintiffs at 10 a.m. While waiting for Glaspie and Wilkins to arrive, Plaintiffs made copies of the complaint and placed them in the mailboxes for Glaspie and Wilkins.

The meeting was attended by all five Plaintiffs, Glaspie, Wilkins, and Wyatt. Sawyer was out of the office and participated in the meeting by telephone. Plaintiff Bowman asked Glaspie and Wilkins if they received their copies of the complaint, and they replied they had. Wilkins stated he understood the lawsuit was not personal, but Glaspie told the Plaintiffs the lawsuit was personal because his name was on it. Sawyer told the Plaintiffs that he was disappointed and disheartened that they had filed a lawsuit and not come to management to talk about any problems. He told Plaintiffs their filing of the lawsuit would have an impact on their ability to perform their duties and it would also impact other employees. The Defendants suspended the Plaintiffs from employment without pay indefinitely pending an investigation of their acts in disrupting the flow of company operations. They were instructed to turn in all of their keys, equipment, and vehicles immediately or the Sheriff's Department would be called for assistance. Plaintiffs were also instructed not to speak with other employees and not to call Comcast about the matter or the Defendants would pursue the Plaintiffs civilly and criminally. Plaintiffs abided by these instructions and left the premises. Since November 24, 2009, Plaintiffs have not been informed of the results of any investigation into their conduct.

5

After the suspensions, Plaintiffs contacted their attorney, who sent a letter to the Defendants demanding that the Plaintiffs be reinstated by 5:00 p.m. on November 24. (Pl. Ex. 1.) In a letter responding to Plaintiffs' attorney, Sawyer stated:

> The affected employees . . . were suspended for the balance of the week ending November 29, 2009 for actions which violated Company policy. These actions included (1) improper use of company property for personal reasons, (2) making threats to undermine the business by making improper contact to company clients and customers, (3) interfering with the Company's ability to conduct its daily business, among other things. We take these matters seriously, and any actions taken by management would arise from these specific violations. These actions were brought to the attention of Company management, and the individuals were suspended. The suspensions were in accordance with Section 12.10 of the 2009 Edition Employee and Technician Handbook. Each employee will receive a letter concerning his suspension and each employee will have the opportunity to resume work for the week beginning November 30, 2009.

(Id.) Neither the cited section of the Employee and Technician Handbook nor the letters sent to the suspended employees were introduced into evidence at the hearing. Thus, the Court has not reviewed those documents.

On Wednesday morning, November 25, Plaintiffs obtained the TRO from Judge Trauger. As stated earlier, Judge Trauger ordered the Defendants to keep Plaintiffs on the payroll with full pay and benefits until a hearing could be held on their request for a preliminary injunction.

When the Plaintiffs who were scheduled to work on Wednesday, November 25, Friday, November 27, and Saturday, November 28[1] reported to the office, however, they were told there were no work assignments for them, although other employees with less seniority and fewer skills were given routes with job assignments. When Plaintiff Webster reported for work on Friday morning, November 27, he provided a copy of the TRO to Wyatt and asked if he had work that day.

---

[1] Thursday, November 26 was Thanksgiving Day and Defendants' offices were closed.

6

Wyatt responded that he did not know. Webster was not assigned a route that day or on Saturday, November 28.

Technician Brett Harlston worked for Defendants as a quality control technician for two (2) years. He is aware that work is usually assigned based on the quality of the work, the knowledge of the person doing the work, and the person's speed in completing the work. Because of his role in quality control, Harlston knew that the Plaintiffs were in the core group of technicians who received the best job assignments. Harlston worked on November 23, and he did not observe the Plaintiffs causing any disturbance in the work place.

On November 25, the day after the Plaintiffs were suspended, Wyatt informed Harlston that his position was changing to installation technician, and Harlston received a number of good job assignments of high quality through December 4. Wyatt also promised Harlston that he would work only in Bellevue and that he would serve as a substitute lead technician and earn more money when lead technician Randy Layman was out of town.

Randy Layman approached Harlston and said, "I heard you was (sic) with the other side." Harlston took this to mean that the Defendants felt as though Harlston held the same views as the Plaintiffs who brought the lawsuit. After that comment, Harlston noticed a change in the quantity and quality of his work and he was no longer allowed to work in Bellevue. Wyatt's promise of a substitute lead technician position also did not materialize. Harlston is receiving less work than he did just after the Plaintiffs' suspension and before Layman's comment, but an amount that is normal for him at this slow time of year.

7

On Monday, November 30, 2009, the Plaintiffs again reported for work as usual at approximately 7:00 a.m. Wyatt informed the Plaintiffs that they would receive work assignments, but not until each of them completed and passed an unannounced drug test. Only the five Plaintiffs, two (2) new technicians and a quality control employee, out of approximately (30) individuals employed by the Defendants, were directed to take a drug test on November 30. The Court expressly rejects Sawyer's and Wyatt's testimony that the Plaintiffs' names were randomly drawn for the drug tests and that Defendants had adopted a new policy requiring any employee returning to work to take a drug test. It is not credible to suggest that the names of all five Plaintiffs would appear in a random draw from thirty (30) names, and Defendants presented no documentary evidence to support their claim that they adopted a "new policy." Wyatt admitted he was not aware of the new policy until the day Plaintiffs returned to work.

Each Plaintiff passed the drug test administered to him. None of the Plaintiffs could recall having been required to take a drug test after their initial pre-employment drug test. Also on November 30, Plaintiff Webster was informed that he would no longer act as lead technician due to budget cuts.

Between Monday, November 30 and Wednesday, December 2, 2009, some Plaintiffs received routes with one or more jobs, but the number of jobs, the quality of the jobs, and the location of the jobs were drastically changed, which significantly reduced the compensation received for the work performed. On some days, one or more Plaintiffs were not assigned a route at all. On Saturday, November 28, Plaintiff Fagan tried to report for work, but he was not allowed onto the premises when he pushed the call button at the gate.

8

Plaintiffs are paid piecemeal; that is, they are paid per job completed, and each type of job is paid at a particular rate. Before the lawsuit was filed, Plaintiffs, who were more senior and experienced technicians, ordinarily were assigned the higher paying jobs and they worked six or seven days per week, putting in 70 or more hours of work during the busy summer season and 60 or more hours of work in the slower winter season. Plaintiffs ordinarily earned as much as $100 to $200 per day before the complaint was filed. After the complaint was filed, Plaintiffs received very few hours of work as compared to their prior work history, and they earned far less, as low as $18 or $21 per day. Last year Plaintiff James Arnold earned $150 to $200 per day. In the three days prior to the December 3, 2009 injunction hearing, Arnold earned only about $120 total. The better jobs were given to technicians who had not joined the lawsuit as Plaintiffs. Certain small job assignments paid so little compensation that Plaintiffs could not justify the expense of child care or gasoline to get to the job site, so they gave the work assignments to other technicians who were already working in the geographical area.

Prior to the filing of the complaint, Plaintiff Webster, a lead technician, earned a daily base rate of $75 per day for his supervisory duties and in addition was paid a set amount for each job he completed. After the filing of the complaint, Plaintiff Webster no longer acted as lead technician, he did not receive the $75 per day base rate, and the compensation for the few jobs he was given plummeted. Defendants did not return Webster to his former position as lead technician even after issuance of the initial TRO.

Before the complaint was filed, Plaintiff Daniel Fagan filled a warehouse position for three hours each morning for which he earned $12 per hour. He distributed needed supplies and equipment to technicians so they could complete their daily work assignments. After finishing the

9

warehouse job, Fagan also ran a route completing various assignments. After the lawsuit was filed, Plaintiff Fagan was told he was no longer allowed to work in the warehouse position. Even after issuance of the initial TRO, Fagan was not reinstated to his warehouse position.

The Court expressly rejects Sawyer's testimony that Fagan was informed five days before the filing of the lawsuit that he was laid off from his warehouse position due to budget cuts. Although Sawyer claimed he had a fax dated November 11, 2009, that would show the warehouse budget cut, he did not introduce the document into evidence. Plaintiff Fagan testified he worked in the warehouse through Monday, November 23, and employee Brett Harlston confirmed that he saw Fagan working in the warehouse as late as November 23.

After the issuance of the TRO on the morning of November 25, 2009, all of the Plaintiffs checked the office bulletin board and other locations in the building, but they did not see posted on the bulletin board or at any other place a notice to employees stating that no retaliatory action would be taken against any individual for exercising his or her rights under the FLSA, as required by Judge Trauger in the TRO. Only the FLSA minimum wage notice appeared on the bulletin board, but that notice had been there for some time. Additionally, Plaintiffs were not aware that any notice as ordered in the TRO was sent or provided to each of Defendants' employees. The Plaintiffs were not aware of any employee meetings during which management staff informed the employees verbally that they would not be retaliated against for exercising their rights under the FLSA.

The individual Defendants deny that they retaliated in any way against the Plaintiffs. In August and September 2009 Defendants received complaints from Comcast, their only client, about the quality of work being done by the technicians and the lack of responsiveness of the Operations Manager, who was then Plaintiff Webster. On August 17, 2009, Defendants replaced Plaintiff

10

Webster as Operations Manager and placed Jeremy Wyatt in that position. Plaintiff Webster testified he stepped down from the position due to stress and because he could earn more money as a lead technician.

Comcast reported to the Defendants that their trouble call rate was too high; in other words, too many customers were calling to complain that work had not been completed satisfactorily by Defendants' technicians. As a result of these trouble calls, Comcast was required to send out technicians to correct the problems. At that time, Comcast maintained a trouble call rate at twelve percent (12%) maximum for each individual technician within a two-week time period. (The percentage recently dropped to ten percent (10%).) Every two weeks, Comcast sent a trouble call report to the Defendants showing the number of job assignments completed by each of Defendants' technicians, the number of trouble calls subsequently received by Comcast about those work assignments, and the technician's percentage of trouble calls compared to total job assignments. The individual Defendants claim that all five of the Plaintiffs and some other employees had significantly high trouble call rates over the three months prior to the filing of the lawsuit and that those high trouble call rates led to the Defendants' eventual decision to suspend the Plaintiffs.

On August 27, 2009, in his new role as Operations Manager, Wyatt met with all technicians and discussed Comcast's standard for trouble calls and urged technicians to keep their trouble call percentages equal to or lower than Comcast's 12% standard. Wyatt was sure that four of the five Plaintiffs attended the meeting, but he could not be sure that Plaintiff Despot attended. Thereafter, Wyatt tracked all of the technicians' performance and verbally counseled those technicians who did not maintain an acceptable trouble call percentage. Wyatt verbally counseled only three of the Plaintiffs about a high trouble call rate and issued written warnings to them on December 2, 2009.

11

The written warnings concerned the week of November 22 to November 28, 2009, the same week the Plaintiffs notified Defendants they had filed this lawsuit and were suspended from their positions on November 24. (Def. Ex. 2.)

Wyatt verbally counseled Plaintiff Despot on September 10th and 17th, November 5th and 12th, and then issued a written warning on December 2 because Despot had a 50% trouble call rate. Despot's written warning stated that he was given two jobs that week and one of them was a trouble call, resulting in a 50% trouble call rate. (Def. Ex. 2.)

Wyatt verbally counseled Plaintiff Arnold on September 10th and 17th and October 1st, and Wyatt intended to counsel Arnold again on October 8th, but Arnold had agreed to go to Atlanta to help out and he was not present in Nashville for Wyatt to counsel him on that date. Wyatt gave Arnold a written warning on December 2 because of a 42.9% trouble call rate. (Def. Ex. 2.)

Wyatt verbally counseled Plaintiff Bowman on September 10th and 17th, October 15th and 22nd, and November 5th. On December 2 Wyatt gave Bowman a written warning for having a 25% trouble call rate. (Def. Ex. 2.)

Wyatt did not verbally counsel Plaintiffs Webster or Fagan or give them written warnings on December 2 because their trouble call rates were acceptable. Wyatt did not explain why, however, he did not verbally counsel Webster when Defendants' Exhibit 1 shows that Webster had a 15% trouble call rate for the week of August 23-29, 15% rate for the week of September 20-26, 14% rate for the week of October 4-10, 13% rate for the week of October 11-17, 13% rate for the week of October 25-31, and 13% rate for the week of November 15 to 21. Fagan had a zero percent (0%) trouble call rate. (Def. Ex. 1.) When the five Plaintiffs' average trouble call rates are examined, there is no support for Sawyer's claim that the Plaintiffs had extremely high trouble call

rates. For the period August 9 to November 28, the average trouble call rates were as follows: Despot – 10%; Fagan – 0%; Arnold – 15%; Bowman – 13%; and Webster – 6%.[2]

Defendants also claim that the Plaintiffs' filing of the lawsuit was coincidental to an investigation Defendants began two months before the lawsuit was filed. Toward the end of each year, Comcast sends out a new contract and requires Defendants to update the criminal background checks, driving records checks, and drug screens on employees. When Wyatt took over as Operations Manager, Sawyer asked to review the files of the Plaintiffs and others with high trouble call rates to see if there was anything in the files that correlated the high trouble call rates with other aspects of the employees' performance with the company. Sawyer claimed he was deeply disturbed to discover certain information in the files that was placed there by Plaintiff Webster as Operations Manager.

According to Sawyer, on April 24, 2009, Comcast asked Defendants to recertify background checks and drug screens. The Operations Manager is the only person who has control over the background checks and the drug screens. Once the Operations Manager recertifies a technician, he

---

[2]The Court finds it troubling that three of the Plaintiffs who testified at the December 3 hearing–Bowman, Arnold and Despot--did not reveal they had been verbally counseled multiple times during the late summer and fall for high trouble call rates or that they received written warnings for their high trouble call rates on the day before the hearing. After checking the transcript of the hearing, (H'rg Tr. at 17, 57, 73-74) it appears to the Court that the questions of Plaintiffs' counsel were carefully crafted to elicit responses that would lead the Court to believe that the Plaintiffs' disciplinary records were clean. These Plaintiffs' lack of candor to the Court damages their credibility. The Court does not consider the December 2 written warnings to be evidence of retaliation by the Defendants because Plaintiffs themselves apparently do not view the written warnings as retaliatory; otherwise, they would have revealed them to the Court and argued their retaliatory nature.

13

submits an Exhibit D for that technician, which is incorporated into the Comcast contract. Sawyer reviewed the background checks that Plaintiff Webster ran on April 24, 2009 and discovered that three (3) of the Plaintiffs, as well as twelve (12) other technicians had misdemeanor or felony citations. Comcast does not allow any felony convictions and misdemeanor convictions must be reported to Comcast under the contract.

Without revealing any names, Sawyer claimed that the background checks disclosed charges for bank robbery, felony harassment, domestic assault, felony sex offenses, drugs, felony DUI, and extremely poor driving records. Because Comcast has the right under the contract to decide whether any technician with a criminal background will be permitted to work for the Defendants, Sawyer testified that Plaintiff Webster's failure to submit proper Exhibit D forms or notify his superiors and Comcast of the results of the background checks amounted to misrepresentation and fraud by concealment. Sawyer also claimed that three of the Plaintiffs were not qualified to hold their jobs as a result of their criminal background checks and they never should have been approved for work in the first place. Two other technicians were fired around this same time period for similar histories.

The background check records Sawyer submitted at the conclusion of the hearing are marked as Defendants Exhibit 3. Plaintiffs objected to receipt of the exhibit in evidence as irrelevant because Wyatt testified he did not begin conducting criminal background checks and drug screens for the upcoming Comcast contract until recently and such checks had nothing to do with the reasons why the Plaintiffs were suspended without pay on November 24. The Court agreed that the exhibit might not be relevant in light of such testimony, but received the exhibit conditionally until the Court could examine it further.

14

Having now examined Defendants' Exhibit 3, the Court finds that portions of the exhibit are relevant and admitted. The first nine (9) pages of the exhibit appear to be a criminal background check that was done on Plaintiff Arnold by backgroundchecks.com. and submitted to Defendant New Vision Telecomm - Nashville, and these nine pages are admitted into evidence. Although each page of this document shows a date of April 24, 2009, in an internet footer at the bottom of the page, the text of the first page states: "Date Report Completed: **Monday, December 31, 2007."** The second page also shows that the background check was "ordered" on "12/31/2007 3:46 EST" and completed shortly thereafter.

Importantly, on the first page of the background check the following appears: "backgroundchecks.com completed the background check according to Comcast-vendorclear's Policies for the below named individual." On the second page, the following appears next to a bullet point: "It was indicated that employment for this individual WILL NOT be negatively affected based on the instant searches run on this subject (Decision made on 12/31/2007)."

These nine pages include documents showing that an aggravated assault charge against Arnold was dismissed, and a Class A misdemeanor domestic assault charge was pled down to a Class B misdemeanor charge of offensive touching, for which Arnold received a suspended sentence of six (6) months probation. Further, another charge of driving on a suspended license was dismissed. The driving record from the State of Tennessee Department of Safety shows that Arnold was cited for a violation of the HOV lane, he failed to satisfy the citation and a suspended license notice was sent, and Arnold's license was then reinstated after further testing. This background check, which apparently satisfied Comcast's own standard for employability, does not appear to support Sawyer's claim that Plaintiff Arnold was not qualified for employment.

15

The next two pages in Defendants' Exhibit 3 are an email from Kenneth Surface, a Comcast manager, to Glaspie, Wilkins, Webster and David Wyatt on January 23, 2009, complaining about Defendants' work performance, and an email from Plaintiff Webster responding to the criticism. Webster referred to two technicians by their "Tech" numbers, but neither technician was identified by name. The Court has not heard any testimony providing the "Tech" numbers for the five named Plaintiffs. Defendant's Collective Exhibit 1, "Trouble Call Summary Comparison," shows what appears to be a "Tech" number for each of the five Plaintiffs. Those numbers do not correspond to the two "Tech" numbers identified in Webster's email. Therefore, the two pages of emails do not appear to be relevant to the instant dispute and the Court disregards them as inadmissible. These two pages are marked for identification only.

The next six (6) pages of Defendants' Exhibit 3 comprise a criminal background check of Plaintiff Bowman and those six pages are admitted into evidence. The first page shows that the background check was ordered July 15, 2008 at 12:16 p.m EDT, even though the internet footer at the bottom of the page contains the date April 24, 2009. Like the background check concerning Plaintiff Arnold, this document includes the statement: "It was indicated that employment for this individual WILL NOT be negatively affected based on the instant searches run on this subject (Decision made on 7/15/2008)." The criminal background check listed a charge of harassment in Alaska that was "dismissed prior to conversion," and a conviction for a 2007 Oregon charge of "violation of basic rule," whatever that might be. This background check, which apparently satisfied Comcast's own standard for employability, does not appear to support Sawyer's claim that Plaintiff Bowman was not qualified for employment.

16

Finally, the last six pages of Defendants' Exhibit 3 concern Plaintiff Fagan. Despite the April 24, 2009 date in the footer, the report was completed on July 17, 2008. There is no report of any prior criminal history. The next page in the document is an "Exhibit D" dated July 17, 2008, which shows that Plaintiff Fagan passed his criminal background check, drug test, and motor vehicle check. These first four pages are admitted into evidence. The last two pages of the exhibit are not relevant and are marked for identification only because they show that Fagan was issued a key and a company vehicle to drive. This background check, which satisfied Comcast's own standard for employability, does not appear to support Sawyer's claim that Plaintiff Fagan was not qualified for employment. In fact, the Court has already mentioned that Plaintiff Fagan had a 0% trouble call rate and Jeremy Wyatt described Fagan as an excellent technician in the field who performed well. Sawyer's claim that the Plaintiffs were suspended as a result of the investigation into their criminal histories and Webster's conduct does not bear weight in light of Wyatt's admission that Sawyer, Glaspie and Wilkins decided to suspend the Plaintiffs only on the evening of November 23, the day the Defendants learned the lawsuit had been filed, because they thought the Plaintiffs would disrupt the work and morale of other employees and interfere with the business of the company.

Sawyer also claimed that the Plaintiffs used company property to make copies of their complaint, passed out the copies to other employees during business hours and otherwise disrupted business by asking other technicians to join the lawsuit. He also deferred to Wyatt to further expound on these points. Wyatt, however, did not know of any employee with whom the Plaintiffs discussed the lawsuit. Plaintiffs denied that they did so and Defendants presented no contradictory evidence. Therefore, on the record presented, the Court finds that the Plaintiffs did not disrupt the work place.

17

Finally, the Court finds that the letter Sawyer wrote to Plaintiffs' counsel on November 24, 2009, explaining the basis for the suspensions did not include the reasons for the suspensions given by the Defendants during the preliminary injunction hearing. Sawyer said nothing in the letter to Plaintiffs' counsel about Wyatt's prior verbal counseling of the Plaintiffs for high trouble call rates nor did he mention the company's investigation into Webster's alleged failure to disclose the Plaintiffs' criminal backgrounds that supposedly disqualified them from working under the Comcast contract.

According to Sawyer, this is Defendants' slow time of year and the amount of work they receive from Comcast has dropped by one-third. On a daily basis, Defendants are sending home five (5) to thirteen (13) technicians for lack of work. Ordinarily, managers try to spread the work available during the slow period among all technicians to keep them employed. To comply with the modified TRO, Defendants claim they are giving the Plaintiffs preference for work and doing so causes disruption and lower morale among other employees. Sawyer also claims employee morale has been affected negatively by the modified TRO which required the Defendants to post and distribute a notice to employees assuring them they will not suffer retaliation for exercising their FLSA rights.

## II. CONCLUSIONS OF LAW

"A preliminary injunction is an extraordinary remedy designed to preserve the relative positions of the parties until a trial on the merits can be held." Tennessee Scrap Recyclers Ass'n v. Bredesen, 556 F.3d 442, 447 (6th Cir. 2009). The Court must assess four factors to determine if Plaintiffs are entitled to a preliminary injunction: (1) whether Plaintiffs have demonstrated a likelihood of success on the merits; (2) whether the Plaintiffs will suffer irreparable harm if the

injunction is not issued; (3) whether the injunction will cause substantial harm to others if issued; and (4) whether granting the injunction will serve the public interest. Id. The Court will address each of these factors, which are interrelated considerations that must be balanced together. Northeast Ohio Coalition for Homeless and Serv. Employees Int'l Union, Local 1199 v. Blackwell, 467 F.3d 999, 1009 (6th Cir. 2006). The probability of success that must be demonstrated is inversely proportional to the amount of irreparable injury the movants will suffer. Id.

**A. Plaintiffs' likelihood of success on the merits**

The anti-retaliation provision of the FLSA provides in part that it is unlawful for an employer "to discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this chapter, or has testified or is about to testify in any such proceeding[.]" 29 U.S.C. § 215(a)(3). The burden-shifting formula of McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973) applies to a FLSA claim of retaliation. Adair v. Charter County of Wayne, 452 F.3d 482, 489 (6th Cir. 2006).

To establish a *prima facie* case of retaliation, an employee must prove that: (1) he engaged in a protected activity under the FLSA; (2) his exercise of the right was known by the employer; (3) thereafter, the employer took an employment action adverse to him; and (4) there was a causal connection between the protected activity and the adverse employment action. Id. Such a *prima facie* showing of retaliation creates a presumption that the employer unlawfully discriminated against the employee. Id. To establish an adverse employment action, the plaintiff must show that, considering all of the circumstances, the defendant's action might well have dissuaded a reasonable worker in the plaintiff's position from filing or supporting a charge of discrimination. Burlington

19

Northern and Sante Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006) ("an indefinite suspension without pay could well act as a deterrent, even if the suspended employee eventually received backpay").

If the employee establishes a *prima facie* case, the burden then shifts to the defendant to set forth a legitimate, non-discriminatory reason for the adverse employment action. Adair, 452 F.3d at 489. If the defendant carries this burden, the employee must prove by a preponderance of the evidence that the defendant's proffered reasons were not its true reasons, but merely a pretext for illegal discrimination. Mickey v. Zeidler Tool and Die Co., 516 F.3d 516, 526 (6th Cir. 2008). The employee may demonstrate pretext by showing that the proffered reason (1) had no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct. Id. The employee must produce sufficient evidence from which a jury could reasonably reject the defendant's explanation and infer that the defendant did not honestly believe in the proffered nondiscriminatory reason for its adverse employment action. Id. To show an honest belief, the employer must be able to establish its reasonable reliance on the particularized facts that were before it at the time the decision was made. Id.

The Court concludes the Plaintiffs have shown a likelihood of success on the merits of their FLSA retaliation claim. A reasonable jury hearing the evidence now before the Court could reasonably find that the Defendants intentionally retaliated against the Plaintiffs.

The five Plaintiffs engaged in protected activity by filing a lawsuit against the Defendants under the FLSA. The Defendants had direct knowledge that Plaintiffs filed the lawsuit against them. Thereafter, Defendants took adverse employment action against the Plaintiffs by suspending them without pay for the remainder of the week, subjecting them to drug testing upon return to work on November 30, and offering work assignments that were dramatically reduced in quantity and quality,

seriously affecting the Plaintiffs' income. Plaintiffs have shown a direct causal connection between the filing of their lawsuit on Friday, November 20, their notification of the filing to the Defendants on Monday, November 23, and Defendants' adverse employment actions directed toward the Plaintiffs starting on the evening of November 23 and continuing even after the TRO was entered. A reasonable jury could find that Plaintiffs can prove a prima facie case of retaliation.

Defendants do not deny that they took adverse employment action against the Plaintiffs. Rather, they claim they took the adverse action for legitimate business reasons and not to retaliate against the Plaintiffs for bringing FLSA claims. A reasonable jury, however, could reject Defendants' proffered reasons for their conduct as having no basis in fact, as not actually motivating the defendant's challenged conduct, or as insufficient to warrant the challenged conduct. Thus, a jury could find on this evidence that Plaintiffs proved pretext and enter a verdict in favor of Plaintiffs on the retaliation claim.

Consequently, the Court finds that Plaintiffs have shown a very strong likelihood of success on the merits of the retaliation claim. This factor weighs heavily in favor of granting the motion for a preliminary injunction. Because the Plaintiffs made such a strong showing on the likelihood of success on the merits of their retaliation claim, the showing required on the remaining factors is inversely proportional and a much lower threshold showing is necessary to obtain an injunction. Northeast Ohio Coalition, 467 F.3d at 1009.

## B. Irreparable harm absent the injunction

Plaintiffs have already suffered the loss of job assignments, pay, seniority, and supervisory or warehouse positions previously held due to Defendants' actions after learning of the FLSA lawsuit. Plaintiffs also demonstrated that Defendants did not comply with the initial TRO, which

caused this Court to enter a modified TRO directing Defendants to post a large notice on their premises and distribute individual notices to employees promising not to retaliate against employees for exercising FLSA rights. Plaintiffs have established through sufficient evidence that they will suffer irreparable harm if the injunction is not issued.

## C. Substantial harm to others

Defendants claim that an injunction will hinder their investigation into the Plaintiffs' backgrounds, require them to keep on the payroll employees who are not qualified to hold jobs under the Comcast contract, and potentially damage their business relationship with Comcast and other employees. Defendants argue the TRO created a work preference for the Plaintiffs that is unfair to other installation technicians and damaged company morale.

The Court found, however, that the evidence produced by the Defendants so far does not support their contentions that all five of the Plaintiffs possessed criminal backgrounds that disqualified them for employment or that Plaintiff Webster committed misrepresentation or fraud by concealment by failing to bring these criminal matters to light. Further, the available evidence convinces the Court for purposes of this motion that, had the Plaintiffs not filed the FLSA lawsuit, they would still be receiving the best job assignments over other technicians, even during this slow business time of year. Balancing the substantial harm to the Plaintiffs against the substantial harm to Defendants and others, the Court concludes that this factor weighs in favor of Plaintiffs.

## D. Impact of the injunction on the public interest

Congress enacted the retaliation provision of the FLSA to protect workers from the type of conduct at issue in this motion. Thus, there is a strong public policy interest in permitting employees to challenge pay practices in federal court without fear of reprisal. Issuance of an

injunction will not have any appreciable negative impact on the public interest, but rather, will have the effect of enforcing a federal law that was passed to protect employees. This factor also weighs in favor of granting an injunction.

### III. CONCLUSION

The FLSA provides for equitable relief in an employee suit brought under the anti-retaliation provision. 29 U.S.C. §§ 215(a)(3); 216(b). Bailey v. Gulf Coast Transp. Inc., 280 F.3d 1333, 1335-1336 (11th Cir. 2002). "An injunction reinstating employees to their former position and restraining further retaliation fits squarely within the relief available under § 216(b), which allows an employee to obtain, 'without limitation,' equitable relief that is 'appropriate to effectuate the purposes' of the antiretaliation provision." Id. A preliminary injunction may be entered because the "antiretaliation provision was meant 'to foster a climate in which compliance with the substantive provisions of the Act would be enhanced' by protecting employees who come forward with complaints." Id. at 1337. Thus, when employees have demonstrated a likelihood of success on the merits and satisfied the other requirements for preliminary injunctive relief, "allowing for such relief to put the employee back in the position he held before the employer's retaliatory conduct is consistent with § 216(b)–it is a form of equitable relief that effectuates the purposes of the antiretaliation provision." Id.

For all of the reasons stated above, Plaintiffs' Motion for Preliminary Injunction (Docket Entry No. 10), will be granted. In an Order to accompany this Memorandum, the Court will impose preliminary injunctive relief under Federal Rule of Civil Procedure 65 against Defendants New Vision Telecommunications, Inc., NVT Georgia Inc., Franklin Glaspie, Jerry Wilkins, and Eric L. Sawyer and against all persons, officers, agents, servants, employees, and attorneys in active concert or participation with them who receive actual notice of the accompanying Order by personal service

23

or otherwise. The Court will require Plaintiffs to post security under Rule 65(c) in the form of a surety bond in the amount of $2,500.00 for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained. The Court will return this matter to the Magistrate Judge to conduct all further case management proceedings necessary to prepare this case for trial on the merits.

An appropriate Order will be entered.

ROBERT L. ECHOLS
UNITED STATES DISTRICT JUDGE